IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSEPHINE WELLS,     )
                     )
          Plaintiff, )
                     )  Civil Action No.: 07 C 3061
      v.             )
                     )  Suzanne B. Conlon, Judge
BERGER, NEWMARK & FENCHEL, P.C. )
AND LAWRENCE ELMAN,  )
                     )
          Defendants.

**MEMORANDUM OPINION AND ORDER**

Josephine Wells sues Berger, Newmark & Fenchel, P.C. ("Berger") for sexual harassment and constructive discharge under Title VII of the Civil Rights Act of 1964 (Count I) and intentional infliction of emotional distress ("IIED") (Count II). She also sues Lawrence Elman for IIED (Count III) and battery (Count IV). Berger moves for summary judgment on Counts I and II. Elman moves for summary judgment on Count III. Wells cross-moves for summary judgment on the issue of corporate liability.

I.  **SUMMARY JUDGMENT STANDARD**

On cross-motions for summary judgment, each movant must satisfy Fed. R. Civ. P. 56's requirements. *Cont'l Cas. Co. v. Northwestern Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 665 (7th Cir. 2007). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable

inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995). Each movant has the burden of establishing there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant satisfies this burden, the non-movant must set forth specific facts demonstrating a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.

## II. BACKGROUND FACTS

Berger is a law firm owned by seven attorneys; Elman owned no more than a 3.04% share. Berger Opp. Facts ¶ 5. Wells was a Berger paralegal from December 2002 until her departure in November 2005. Berger Facts ¶ 1. The firm has approximately 25 employees, consisting of 15 lawyers and 10 support staff. Pl. Facts ¶ 7. Elman has been a shareholder of the firm since 1993. *Id.* ¶ 10. Elman is a vice president at Berger. *Id.* ¶ 12.

A few months after Wells began working at Berger, Elman began forwarding joke emails to her or leaving email print-outs on her chair. Elman Facts ¶ 6. The jokes were a mix of innocent and offensive jokes – including jokes with pornographic cartoons and images. *Id.* ¶ 11. Wells repeatedly informed Elman that she did not wish to see any more inappropriate emails. *Id.* ¶ 8. In spite of her request, Elman continued to leave copies of emails on her chair. *Id.* ¶ 11. Additionally, Elman often read offensive jokes after coming into Wells' office, shutting the door and standing in front of the door. Wells Dep. at 17.

Wells was informed by paralegal Bill Scott that other partners knew of Elman's pornography habits, but that the firm ignored and condoned his conduct. Elman Facts ¶ 25. Former Berger attorney David Lloyd indicated that Elman once showed him a pornographic

cartoon and that Elman left sexually explicit materials on his desk or on firm copy machines. Pl. Add. Facts ¶ 18. Lloyd told Elman to refrain from giving him inappropriate materials and leaving inappropriate materials in open sight. *Id.* ¶ 19. Lloyd spoke to Berger attorney Lynn Lucchese-Soto about Elman's conduct on at least one occasion. *Id.* ¶ 20. Lucchese-Soto told Lloyd that other female staff members had complained of Elman's pornography and that she spoke to Elman about it. *Id.*

In March 2004, Elman walked into Wells' office, closed the door and read her a joke about "a little boy with a penis so large he could do different things with it." Pl. Add. Facts ¶ 8. Wells formally complained to Lucchese-Soto about the incident; Lucchese-Soto told Elman to refrain from offering any more jokes to Wells. Elman Facts ¶ 13; Berger Facts ¶ 15.

A few days later, after Lucchese-Soto informed Wells that her complaint was addressed, Elman returned to Wells' office and read her a joke entitled "the ones that Hallmark rejected." Pl. Add. Facts ¶ 11. After this incident, Wells believed it was futile to complain because the firm was unwilling to restrain Elman's conduct, and that she would be retaliated against if she complained further. Pl. Add. Facts ¶ 22.

Elman continued to leave emails for Wells (excising the to/from lines of the emails), and entered her office approximately once a week to relate sexual jokes or pornographic emails. Pl. Add. Facts ¶¶ 14-15; Wells Dep. at 21, 26. Wells repeatedly complained to Elman without avail; Elman dismissed her complaints by relating jokes with a "little smile on his face." Pl. Add. Facts ¶ 16.

In addition to the emails/images, Elman made several sexually charged comments to Wells.

3

- In July 2004, while Wells shook a bottle of white-out to give to Elman, he remarked, "Oooh, I like the way you shake that." Elman Facts ¶ 30.

- That same day, Elman walked behind Wells to use a typewriter in her office. As she inched her chair away from him, he grabbed her chair and told her not to move. She then bent uncomfortably forward to avoid touching him while he used the typewriter. *Id.* ¶ 31.

- That same month, as Elman waited for copies from a printer, Wells told him he did not have "anything coming." He bent over and remarked in her ear, "that's what my wife said last night." *Id.* ¶ 33.

- In August 2004, Elman was walking behind Wells and remarked, "swing it, baby, swing it. I like the way you swing that thing." When Wells quickened her pace, Elman walked close enough behind Wells to step on her heel and cause her shoe to come off. *Id.* ¶ 34

- In August 2004, Elman stopped in front of Wells' office and asked her to ask paralegal Bill Scott about "those women sitting on champagne bottles." *Id.* ¶ 35.

- In October 2004, Wells was cleaning up after a firm Halloween party. As she carried glasses to the kitchen she called out, "coming through." Elman came up behind Wells and whispered, "I sure would like to come through you." *Id.* ¶ 37.

In early 2005, Wells began working with Elman. It is disputed whether Wells specifically objected to working with him. Viewing the facts in Wells' favor, on one occasion, after Elman summoned Wells to his office regarding a real estate project, she knocked on his door and was told to come in. Upon entering, Wells saw an image of a topless woman on his computer screen. When Elman saw her reaction, he quickly turned around and exited the image on his computer. *Id.* ¶ 38. In August 2005, while Wells was working in Elman's office, he directed her to get "her cute little fanny over here." *Id.* ¶ 40.

On November 30, 2005, Elman and Wells nearly collided as they passed each other in a hallway. Elman positioned himself and swung papers to hit Wells on the buttocks, mimicking a golf swing. *Id.* ¶ 44. After the incident, Wells told Elman that the touching was totally unnecessary; Elman followed Wells to her office, apologizing. *Id.* ¶ 45. Wells then left work

4

early because she was offended by the incident. Wells Dep. at 46-47. The next morning, Wells informed Lucchese-Soto of the incident, and that she would not be working that day. *Id.* ¶ 57. Lucchese-Soto asked her if Elman had just been kidding around, and whether his actions were misconstrued. Pl. Add. Facts ¶ 28. Lucchese-Soto asked Wells to provide a written summary of other incidents involving Elman's conduct, and conducted an investigation. Berger Facts ¶ 32. Although Elman admitted that he physically touched Wells, Lucchese-Soto found no other corroborating witnesses regarding whether the incident was intentional. *Id.* ¶¶ 33-34. Lucchese-Soto offered Wells a week off of work and promised to move Elman's office farther away from Wells' office. *Id.* ¶¶ 39, 43. When Wells discovered Elman's office had not been timely relocated, Wells informed Lucchese-Soto the following week that she would not return (or was thinking of not returning). Pl. Add. Facts ¶ 35. Lucchese-Soto informed Wells that if she resigned, Berger would withhold her bonus, and Wells would likely have difficulty finding another job at her age. *Id.* ¶ 30.

Wells claims that Elman's conduct – culminating with the hallway touching incident – caused continued stress and anxiety. She claims her self-esteem suffered and that she neglected her hair, nails, and clothes. *Id.* ¶ 31. She was distracted at work and felt she could no longer adequately perform her job. *Id.* ¶ 32. Wells hyperventilated and twice sought medical treatment. *Id.* ¶ 33. After the hallway incident, she felt physically and sexually threatened, and had flashbacks of molestation as a child. *Id.* ¶¶ 34-35. She cried repeatedly as a result of Elman's conduct. Wells Dep. at 53. She continually felt threatened by Elman's objectionable behavior. Wells Dep. at 137.

### III. DISCUSSION

5

## A. BERGER'S MOTION FOR SUMMARY JUDGMENT

Berger argues that Wells has failed to present a *prima facie* Title VII or IIED claim. Wells responds that the record raises disputed questions of fact that preclude summary judgment on each of her claims.

### *1. Sexual Harassment in a Hostile Work Environment Claim*

To prevail on a claim of sexual harassment based on hostile work environment, Wells must establish that: (1) she was subjected to unwelcome harassment; (2) the harassment was based on her sex; (3) the harassment was sufficiently severe or pervasive so as to alter the condition of her employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007). The parties dispute the third and fourth prong of the *prima facie* case.

To satisfy the third prong, Wells must demonstrate that Elman's behavior was both objectively and subjectively offensive. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004). Several factors determine whether alleged harassment was objectively offensive, including the frequency of the conduct; its severity; whether it was physically threatening or humiliating, or just an offensive utterance; and whether the conduct unreasonably interfered with work performance. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806-07 (7th Cir. 2000). "Drawing the line is not always easy. On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures . . . [o]n the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995).

6

Berger insists the record only shows that Elman was coarse and boorish towards Wells, but that there is no evidence to support a theory of sexual harassment. Berger also contends there is no evidence that Elman's conduct was pervasive, insofar as Wells only claims to have experienced a handful of incidents – 10 over the span of 21 months. Wells disputes this characterization, arguing that questions of fact regarding the severity and pervasiveness of Elman's conduct still remain.

Drawing all reasonable inferences in Wells' favor, she may have been subject to more than just boorish behavior. She offers evidence that over the course of 21 months at Berger, Elman repeatedly forwarded her or related sexually obscene jokes, including pornographic pictures. Wells Dep at 7, 26. Although she specifically identifies only a handful of jokes, she states that Elman related inappropriate sexual jokes at a rate of approximately once a week from 2003 to 2005. Wells Dep. at 8, 26. These jokes were accompanied by incidents where Elman directly made sexual comments to Wells, culminating with an incident in which Elman touched her buttocks with papers.

Berger argues Wells' failure to report complaints to Lucchese-Soto indicates a lack of subjective belief in the severity of Elman's conduct. This is an issue of material fact. Wells testified it would be futile to repeatedly complain and that further complaints might lead to her termination because of circumstances surrounding another recently terminated employee. Pl. Add. Facts ¶ 12. After the November 2005 touching incident, Wells felt compelled to formally complain because of the severity of the incident, believing it would put her job at risk. Wells' subjective belief regarding whether she was at risk of losing her job is a credibility determination not appropriately resolved on a summary judgment motion. *Payne v. Pauley*, 337 F.3d 767, 770

(7th Cir. 2003) (citations omitted). The record contains sufficient evidence to support a reasonable inference that she subjectively believed she was subject to a hostile environment.

Berger's argument that there are no grounds for employer liability is also unavailing. As Wells points out, Berger does not present any argument as to why Elman should be treated as Wells' peer or co-worker, as opposed to Wells' supervisor or a proxy of the firm. As discussed more fully below, there are disputed facts whether Elman was within the class of Berger officials who may be treated as Berger's proxy. *See, e.g., Johnson v. West*, 218 F.3d 725, 729-30 (7th Cir. 2000); *see also Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376 (5th Cir. 2003) (holding that questions of fact remained as to whether a minority owner, president, and general manager should be treated as a corporation's proxy). Accordingly, summary judgment is inappropriate.

## 2. *Constructive Discharge*

For a Title VII constructive discharge claim, Wells must prove that her working conditions were so intolerable that a reasonable person would be forced into involuntary resignation. *Pa. State Police v. Suders*, 542 U.S. 129, 147, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). Generally, a plaintiff's working conditions must be even more egregious than the high standard for hostile work environment claims, because an employee is expected to remain employed while seeking redress. *Boumehdi*, 489 F.3d at 789 (citing *Tutman v. WBBM-TV, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000)).

Wells proffers sufficient evidence of Elman's pattern of misconduct to withstand summary judgment. *See, e.g., Boumehdi*, 489 F.3d at 790 (repeated offenses and the failure to respond are sufficient to survive summary judgment on constructive discharge claim). There is evidence to support her contention that complaining was futile and that Elman's offensive

8

conduct escalated after her original 2004 complaint. A jury could reasonably conclude that Wells had no choice but to resign. Accordingly, Berger's motion for summary judgment on Wells' constructive discharge claim lacks merit.

### 3. IIED Claim

To state an IIED claim, Wells must show that: (1) Berger's conduct was extreme and outrageous; (2) Berger either intended to inflict severe emotional distress or knew that there was a high probability that its conduct would do so; and (3) Berger's conduct actually caused severe emotional distress. *Lifton v. Board of Educ. of City of Chicago*, 416 F.3d 571, 579 (7th Cir. 2005) (citation omitted). Whether Berger's conduct was extreme and outrageous is an objective consideration. *McGrath v. Fahey*, 126 Ill.2d 78, 90, 127 Ill.Dec. 724, 533 N.E.2d 806 (Ill. 1988). Liability does not extend to "mere insults, indignities, threats, annoyances, petty oppressions or trivialities." *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 89-90, 4 Ill.Dec. 652, 360 N.E.2d 765 (1976).

Wells claims Berger intentionally subjected her to emotional distress by turning a blind eye to Elman's harassment of her for 21 months, failing to remedy the situation, and then engaging in protracted litigation against Wells for unemployment benefits after she resigned. Viewing the record in her favor, the record supports a reasonable inference that Berger intended to cause Wells emotional distress by failing to prevent Elman from harassing her.

### B. ELMAN'S MOTION FOR SUMMARY JUDGMENT ON COUNT III

Elman moves for summary judgment on Wells' IIED claim, arguing that the record does not support a finding that: (1) Elman engaged in severe and outrageous conduct; (2) Elman either intended to inflict severe emotional distress or knew there was a high probability that his conduct

9

would do so; and (3) Elman's conduct actually caused severe emotional distress. Wells maintains that factual issues preclude summary judgment.

### *1. Extreme and Outrageous Conduct*

The circumstances surrounding a typical employment dispute usually do not constitute level of extreme and outrageous conduct. *Lara v. Diamond Detective Agency*, 412 F. Supp. 2d 894, 902 (N.D. Ill. 2006) (Plunkett, J.) (citing *Piech v. Arthur Andersen & Co.*, 841 F. Supp. 825, 831 (N.D. Ill. 1994) (intentional infliction of emotional distress requires more than what is required for sexual harassment)). Extreme and outrageous behavior may exist in the employer/employee context when the employer clearly abuses the power it holds over an employee in circumstances far more severe than typical disagreements or job-related stress caused by the average work environment. *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 604 (7th Cir. 2006) (citation omitted). Whether conduct is extreme and outrageous is based on an objective standard considering all facts and circumstances. *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 567 (7th Cir. 1997).

Elman argues Wells does not advance sufficient evidence to support a finding that his conduct was extreme and outrageous. He contends the record only shows that he read or left her some email jokes, that he made five or six comments during a year-and-a-half period, and that following a near collision in a hallway, he touched her on the buttocks with a few pieces of paper. The record does not support summary judgment.

Viewing the evidence in Wells' favor, Elman's conduct exceeded typical on-the-job disagreements. He communicated pornographic and other offensive emails to Wells once a week over a year-and-a-half span, even though she told him "all the time" that she did not want to see

or receive those emails. When Wells formally lodged a complaint against Elman in March 2004, Elman continued to expose her to sexual jokes, often with a "little smile" on his face, and at times alone in her office with the door closed. Wells Dep. at 16-17. This conduct was compounded by sexually explicit comments and innuendo and a physical touching.

A reasonable inference may be drawn that Elman abused his position of authority to target Wells. *See, e.g., Lewis v. City of Chicago*, No. 04 C 3904, 2005 WL 947195, at *10 (N.D. Ill. Apr. 11, 2005) (Conlon, J.) ("[c]onduct may be characterized as extreme where . . . the conduct arises out of an abuse of a position . . . or defendant knew of some peculiar susceptibility of the plaintiff to emotional distress"). Although Elman insists he had no authority over Wells, the record reflects this is a disputed issue. Elman was an attorney of the law firm and a shareholder-owner since 1993. Wells was a new employee in 2002, hired as a paralegal to support the work of Berger attorney-owners. This disparity supports a reasonable inference Elman had power over Wells. A jury could reasonably conclude that Elman abused his position of authority over Wells and that his conduct was therefore extreme and outrageous.

## 2. *Intent*

Berger argues that Wells cannot prove Elman intended to cause her severe emotional distress because she only communicated to Elman that she was "not interested" in receiving his email jokes. Whether Elman intended to cause Wells severe emotional distress is a disputed factual issue. Wells testified she repeatedly told Elman she was offended by his inappropriate emails. After her formal complaint in March 2004, Lucchese-Soto notified Elman to stop sending Wells inappropriate emails because they were unwanted. Nevertheless, Elman continued to relate to her inappropriate emails. Wells complained to Elman about his inappropriate

11

comments. A reasonable jury could find that this evidence supports a finding that Elman knew that exposing Wells to sexually oriented emails was unwelcome, and that his continued conduct might cause emotional distress. *See, e.g., Naeem*, 444 F.3d at 606 (discussing relevance of defendants' knowledge of plaintiff's susceptibility to emotional distress).

### 3. *Emotional Distress*

Finally, Elman argues Wells' emotional distress claim fails because Wells has not demonstrated severe emotional distress. Severe emotional distress is distress so severe that no reasonable person could be expected to endure it. *See Lifton*, 416 F.3d at 579 (citations omitted). The record supports a reasonable inference Wells felt threatened by Elman's inappropriate conduct. Pl. Add. Facts ¶¶ 31-35; Wells Dep. at 137. Elman argues Wells did not seek psychological or medical treatment when Berger offered it to her. However, her testimony provides evidence that she suffered severe emotional distress. *See, e.g., Naeem*, 444 F.3d at 606 (seeking psychiatric help is not a necessary condition to a finding that a defendant actually suffered from severe emotional distress). A determination of the credibility of Wells' testimony regarding the symptoms of her emotional distress is not appropriate on a motion for summary judgment. *Payne*, 337 F.3d at 770 (citations omitted).

### C. WELLS' MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF BERGER'S CORPORATE LIABILITY

Wells cross-moves for summary judgment on the issue of corporate liability, contending that if Elman sexually harassed her, Berger is directly liable as a matter of law. Wells argues that because Elman is a Berger owner and corporate officer, he was Berger's "proxy" or "alter-ego" for Title VII purposes. Berger responds that it cannot be vicariously liable for Elman's acts

because Elman did not control or manage the firm. Alternatively, Berger contends there are disputed facts regarding whether Elman can be deemed a proxy for Berger.

An employer is subject to vicarious liability automatically when the harasser is either (1) "indisputably within that class of an employer organization's officials who may be treated as the organization's proxy," or (2) "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Johnson*, 218 F.3d at 730 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 789-90, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

It is a disputed factual issue whether Elman was Berger's proxy. In 2005, Elman owned just 3.04% of the firm, with six others owning the balance. Berger Opp. Facts ¶¶ 4-5. Although each attorney with an ownership interest had an officer's title, the firm was principally governed by its board of directors. *Id.* ¶¶ 2, 6. Accordingly, Wells' motion for summary judgment must be denied.

ENTER:

*[signature: Suzanne B. Conlon]*

January 10, 2008

Suzanne B. Conlon
United States District Judge